**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Benjamin Freeman, | No. CV-20-00287-TUC-RM |
| Plaintiff, | **ORDER** |
| v. | |
| Douglas Ducey, et al., | |
| Defendants. | |

Pending before the Court are Plaintiff's Motion for Leave to File an Amended Complaint (Doc. 17) and Motion for Leave to File a Supplemental Complaint (Doc. 19). Defendant responded to both of Plaintiff's Motions (Docs. 22, 23), and Plaintiff replied (Doc. 29). Also pending before the Court is Plaintiff's Motion to Strike Defendant's Responses to Plaintiff's Motions for Leave to File an Amended Complaint and a Supplemental Complaint. (Doc. 26.) Defendant responded to Plaintiff's Motion to Strike (Doc. 27), and Plaintiff replied (Doc. 35).[1]

**I.   Background**

On June 26, 2020, Plaintiff, who is confined in the Arizona State Prison Complex ("ASPC")-Tucson, filed a pro se civil rights Complaint pursuant to 42 U.S.C. § 1983. (Doc. 1.) On July 28, 2020, the Court granted Plaintiff's Application to Proceed In Forma Pauperis,[2] ordered Defendant Shinn to answer the claims for prospective injunctive relief

---

[1] Plaintiff's Motion for Appointment of Counsel (Doc. 45) will be addressed separately.
[2] The Court recognized that Plaintiff has accumulated three strikes for purposes of 28 U.S.C. § 1915(g) but nevertheless allowed him to proceed in forma pauperis, finding that he met the imminent danger exception. (Doc. 6 at 1–4.)

1   only, and dismissed the remaining claims and Defendants. (Doc. 6.) On October 26,

2   2020, Defendant Shinn filed an Answer to Plaintiff's Complaint. (Doc. 10.)

3   **II.   Motion to Strike**

4       Plaintiff moves pursuant to Federal Rule of Civil Procedure 12(f)(2) to strike

5   Defendant's Responses to his Motions for Leave to File Amended and Supplemental

6   Complaints, arguing that the Responses are premature. Plaintiff contends that Defendants

7   "jumped the gun" by filing "immaterial, irrelevant and impertinent Responses" before

8   they had been served with copies of the Amended Complaint or Supplemental Complaint

9   pursuant to Rule 5(b). Defendant argues that Plaintiff's Motion should be denied because

10  responses to motions are not pleadings for purposes of Rules 7(a) and 12(f) of the Federal

11  Rules of Civil Procedure. (Doc. 27 at 1.)

12      A party may file a motion to strike (1) "only if it is authorized by statute or rule,

13  such as Federal Rules of Civil Procedure 12(f)" or (2) if it seeks to strike "any part of a

14  filing or submission on the ground that it is prohibited (or not authorized) by a statute,

15  rule, or court order." LRCiv 7.2(m)(1). Federal Rule of Civil Procedure 12(f) provides

16  that a court "may strike from a pleading an insufficient defense or any redundant,

17  immaterial, impertinent, or scandalous matter" either "on its own" or "on motion made

18  by a party[.]" Rule 12(f) specifically relates to striking matters from pleadings and does

19  not authorize courts to strike "documents that are not pleadings." *Silva v. West*, 333

20  F.R.D. 245, 247 (N.D. Fla. 2019) (citing *Wimberly v. Clark Controller Co.*, 364 F.2d 225,

21  227 (6th Cir. 1966)); *see also Sidney-Vinstein v. A.H. Robins Co.*, 697, F.2d 880, 885 (9th

22  Cir. 1983) (holding that the district court erred in striking a motion to reconsider under

23  Rule 12(f) because the motion was not a pleading).

24      Federal Rule of Civil Procedure 7(a)(1)–(7) lists only the following as pleadings:

25  (1) a complaint; (2) an answer to a complaint; (3) an answer to a counterclaim designated

26  as a counterclaim; (4) an answer to a crossclaim; (5) a third-party complaint; (6) an

27  answer to a third-party complaint; and (7) a reply to an answer, if the court orders one. A

28  response to a motion is not a pleading. *Calkins v. Shapiro & Anderson*, L.L.P., No. 05-

- 2 -

1   0815-PHX-ROS, 2005 WL 3434718, at *3 (D. Ariz. Dec. 13, 2005).

2         The Court may not strike Defendant's Responses pursuant to Federal Rule of Civil

3   Procedure 12(f) because the Responses are not pleadings.[3] Nor may the Court strike the

4   Responses under LRCiv 7.2(m)(1) as prohibited or unauthorized by a statute, rule, or

5   court order. Defendant was authorized pursuant to Local Rule of Civil Procedure 7.2(c)

6   to respond to Plaintiff's Motions, and Defendant's Responses are timely. Therefore, the

7   Court will deny Plaintiff's Motion to Strike.

8   **III.    Motion for Leave to File Amended Complaint**

9         Federal Rule of Civil Procedure 15(a) provides that, except in circumstances not

10  present here, "a party may amend its pleading only with the opposing party's written

11  consent or the court's leave." Fed. R. Civ. P. 15(a)(2). Because Plaintiff does not have

12  Defendant's written consent to amend his complaint, Plaintiff requires the Court's leave.

13  *See id*. 15(a)(2). District courts have discretion to determine whether to grant or deny

14  leave to amend, *Foman v. Davis*, 371 U.S. 178, 182 (1962); however, leave should freely

15  be given "when justice so requires," Fed. R. Civ. P. 15(a)(2). The Ninth Circuit has

16  directed that the above-stated policy "be applied with extreme liberality." *Morongo Band*

17  *of Mission Indians v. Rose*, 893 F.2d 1074, 1079 (9th Cir. 1990). "This liberality in

18  granting leave to amend is not dependent on whether the amendment will add causes of

19  action or parties." *DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 186 (9th Cir. 1987). In

20  ruling on a motion to amend, a court must consider whether there has been "'undue

21  delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure

22  deficiencies by amendments previously allowed, undue prejudice to the opposing party

23  by virtue of allowance of the amendment, futility of amendment, etc.'" *Eminence*

24  *Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) (quoting *Foman*, 371

25  U.S. at 182). "Absent prejudice, or a strong showing of any of the remaining *Foman*

26  factors, there exists a *presumption* under Rule 15(a) in favor of granting leave to amend."

27  *Id.*

28

---

[3] Plaintiff's reliance on Federal Rule of Civil Procedure 5(b)(1) is likewise not applicable as that rule applies only to serving *pleadings* rather than *motions*.

Plaintiff has not previously amended his Complaint, and his Motion to Amend is timely pursuant to the deadline set in the Court's Scheduling Order for moving to amend pleadings. (Doc. 11 at 2.) The Court finds no evidence of undue delay, bad faith, or dilatory motive on Plaintiff's part. Furthermore, the Court does not find, at this early stage of the proceedings, that Defendant would be prejudiced by Plaintiff's requested amendment. Although Plaintiff's First Amended Complaint ("FAC") reasserts claims from his original complaint, the FAC includes new facts in support of those claims, and the Court does not find that the requested amendment would be futile. Additionally, although Defendant Shinn argues that "none of [Plaintiff's] new allegations implicate him or the claims that are presently before the Court," the argument is insignificant, because a plaintiff may litigate new claims added in an amended complaint, so long as they are administratively exhausted prior to the amendment. *Cano v. Taylor*, 739 F.3d 1214, 1220 (9th Cir. 2014) (holding that "claims that [arise] as a cause of action prior to the filing of the initial complaint may be added to a complaint via an amendment, as long as they are administratively exhausted prior to the amendment"). The Court will grant Plaintiff leave to amend under Rule 15(a)(2) and will order the Clerk of Court to file Plaintiff's FAC (currently lodged at Doc. 18). Plaintiff's FAC supersedes his original complaint; thus, the latter will be treated as non-existent. *Rhodes v. Robinson*, 621 F.3d 1002, 1005 (9th Cir. 2010).

**IV.   Statutory Screening of Prisoner Complaints**

The Court is required to screen complaints brought by prisoners seeking relief against a governmental entity or an officer or employee of a governmental entity. 28 U.S.C. § 1915A(a). On review, the Court must dismiss a complaint or any portion of it if a plaintiff has raised claims that are legally frivolous or malicious, fail to state a claim upon which relief may be granted, or that seek monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915A(b)(1)–(2).

A pleading must contain "a short and plain statement of the claim *showing* that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2) (emphasis added). While Rule 8 does

not demand detailed factual allegations, it does "demand[] more than an unadorned, the defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. *Id*.

"[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id*. (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. "Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id*. at 679. Thus, although a plaintiff's specific factual allegations may be consistent with a constitutional claim, a court must assess whether there are other "more likely explanations" for a defendant's conduct. *Id*. at 681.

As the United States Court of Appeals for the Ninth Circuit has instructed, courts must "continue to construe *pro se* filings liberally." *Hebbe v. Pliler*, 627 F.3d 338, 342 (9th Cir. 2010). A complaint filed by a *pro se* prisoner "'must be held to less stringent standards than formal pleadings drafted by lawyers.'" *Id*. (quoting *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam)). Nevertheless, conclusory and vague allegations will not support a cause of action, and "a liberal interpretation of a civil rights complaint may not supply essential elements of the claim that were not initially pled." *Ivey v. Bd. of Regents*, 673 F.2d 266, 268 (9th Cir. 1982).

## V.   First Amended Complaint

In his FAC, Plaintiff names the following individuals as Defendants: Arizona Governor Douglas Ducey; Arizona Department of Corrections ("ADC") Director David Shinn; Nurse Riley; Physician Assistant Natalyie Weizel; Health Services Director Richard Pratt; Doctor Natalie Bell; Centurion Health; Deputy Warden David Neil; Deputy Warden Martinez; Warden Pacheco; and Captain Baker. (Doc. 18 at 3.) Plaintiff sues all of the above-named Defendants in their individual capacities, and states that he is

also suing Ducey, Shinn, and Centurion Health in their official capacities. (*Id*.) Plaintiff designates all counts as Eighth Amendment threat-to-safety claims. (*Id*. at 7–20.) Plaintiff seeks monetary and injunctive relief. (*Id*. at 22–24.)[4]

In **Count I**, Plaintiff alleges that Defendants Shinn, Pacheco, and Neil acted with deliberate indifference to Plaintiff's safety by failing to develop and implement a comprehensive plan to prevent and manage the spread of the COVID-19 virus in Arizona's prisons and to address "overcrowding, double-bunking, and social distancing" in the Manzanita Unit where Plaintiff is housed. (*Id*. at 7.) Plaintiff claims that Defendant Shinn knows that the Manzanita Unit was originally built to house 24 female prisoners but now houses 48 double-bunked male prisoners, and in **Count I(A)** he alleges that social distancing in the unit is impossible because only two feet separate him from his cellmate and only four feet separate him from the neighboring prisoner's cell. (*Id*. at 7–8.) In **Count I(B)**, Plaintiff alleges that the air ducts in the Manzanita Unit recirculate "all kinds of junk," including COVID-19, and Defendants have failed to clean them. (*Id*.) In **Count I(C)**, Plaintiff alleges that Defendants Ducey, Shinn, Pacheco, Neil, and Baker acted with deliberate indifference by providing only staff and administrators with face masks but failing to provide prisoners with face masks until July 2020. (*Id*. at 9.) In **Count I(D)**, Plaintiff alleges that Defendants Ducey and Shinn act with deliberate indifference by failing to consider, create, and/or revise prison reduction tools—such as home arrest, work furlough, or compassionate leave programs—to abate the risk of COVID-19 infections. (*Id*. at 9.) Plaintiff similarly alleges in **Count I(F)** that Defendant Ducey acts with deliberate indifference by refusing to consider, or instruct Shinn to use, measures such as home arrest, compassionate release, and early release programs to reduce the prison population and prevent the spread of COVID-19 to vulnerable inmates.

---

[4] Plaintiff also requests that the Court order Defendants to immediately reduce the prison population by releasing prisoners who are vulnerable to COVID-19 and placing them on home arrest, work furlough, or other preexisting programs that will shorten their sentences of incarceration. (*Id*. at 22.) As previously stated in the screening of Plaintiff's original Complaint, the Court cannot order Plaintiff's release, or any other prisoner's release, in a § 1983 action. *See Preiser v. Rodriguez*, 411 U.S. 475, 488–90 (1973) (if a prisoner seeks relief that will result in immediate or speedier release, his exclusive remedy is a petition for habeas corpus).

1    (*Id.* at 14–17.)

2        In **Count I(E)**, Plaintiff alleges that Defendants Ducey, Shinn, Pacheco, Neil, and

3    Baker failed "to scrutinize and micromanage their employees" to ensure proper

4    implementation of Infectious Disease Symptoms Check ("IDSC") protocols. (*Id.* at 7,

5    11.) Specifically, Plaintiff alleges that employees' temperatures are checked and noses

6    are swabbed every three days instead of daily as required; that staff are allowed to enter

7    the unit and interact with prisoners before the results of their health check are available;

8    and that correctional officers fail to wear masks when interacting with prisoners. (*Id.* at

9    11–12.) Plaintiff further alleges that, due to Defendants' failure to demand employees'

10   strict compliance with IDSC protocols, prisoners have become ill and died; Plaintiff

11   provides specific examples of instances in which alleged breaches of IDSC protocols

12   resulted in prisoners becoming infected with COVID-19. (*Id.* at 12; *see also id.* at 16–17.)

13       Plaintiff further claims in Count I that Defendants know that the Manzanita Unit is

14   equipped with only three toilets, three showers, and three face bowls for 48 prisoners,

15   resulting in prisoners waiting in line to use the facilities. (*Id.* at 7-8.) Plaintiff states that

16   waiting to use the restroom is a "bad experience on a daily basis for [him]" because he

17   suffers from "celiac[] disease, extreme flatulence, constipation[,] and from colonoscopies

18   and endoscopies in 2019-2020." (*Id.* at 7.) Plaintiff further indicates that he has

19   repeatedly soiled himself while waiting in line to use the toilets, and then must wait in

20   line in soiled clothing to use the showers. (*Id.* at 7–8.)

21       In **Count II**, Plaintiff alleges that Defendant Weizel acted with deliberate

22   indifference by failing to authorize a consultation with a pulmonary specialist. (*Id.* at 19.)

23   Plaintiff states that he informed Weizel, Shute, and Bell in 2018 and 2019 that he

24   experiences heart palpitations and shortness of breath when he is exposed to second-hand

25   cigarette smoke. (*Id.*) He also explained to Defendants that he smoked for 42 years prior

26   to 2007, when he was stabbed in the lungs and was told that he could lose a lung if he

27   continued to smoke. (*Id.*) Plaintiff alleges that Weizel scheduled him for cardiology

28   consultations but not a pulmonology consultation. (*Id.*)

1    In **Count III**, Plaintiff alleges that Defendant Riley also acted with deliberate

2    indifference by failing to schedule Plaintiff for a pulmonology consultation. (*Id.* at 20.)

3    Plaintiff alleges that he informed Riley of the same facts he explained to Shute and Bell

4    and also told Riley that a cardiologist reported in March 2020 that Plaintiff's heart is in

5    good condition but that Plaintiff may benefit from a pulmonology consultation. (*Id.*)

6    Plaintiff further alleges that Riley's failure to schedule a pulmonology consultation

7    resulted in Plaintiff experiencing coughing, sneezing, chest pain, and shortness of breath.

8    (*Id.*)

9    **VI.    Discussion**

10    A cause of action exists under 42 U.S.C. § 1983 against "[e]very person who,

11    under color of any statute, ordinance, regulation, custom, or usage, of any State . . .

12    subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation

13    of any rights, privileges, or immunities secured by the Constitution or laws[.]" To prevail

14    on a § 1983 claim, a plaintiff must show that (1) acts by the defendants (2) under color of

15    state law (3) deprived him or her of federal rights, privileges, or immunities, and (4)

16    caused him or her damage. *Thornton v. City of St. Helens*, 425 F.3d 1158, 1163–64 (9th

17    Cir. 2005) (quoting *Shoshone-Bannock Tribes v. Idaho Fish & Game Comm'n*, 42 F.3d

18    1278, 1284 (9th Cir. 1994)). Additionally, a plaintiff must allege (1) that he or she

19    suffered a specific injury as a result of the conduct of a particular defendant and (2) an

20    affirmative link between the injury and the conduct of that defendant. *Rizzo v. Goode*,

21    423 U.S. 362, 371–72, 377 (1976).

22    A suit against a defendant in his or her *individual* capacity seeks to impose

23    personal liability upon the official. *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985).

24    For a person to be liable in his or her individual capacity, "[a] plaintiff must allege facts,

25    not simply conclusions, that show that an individual was personally involved in the

26    deprivation of his [or her] civil rights." *Barren v. Harrington*, 152 F.3d 1193, 1194 (9th

27    Cir. 1998). There is no *respondeat superior* liability under § 1983; thus, a defendant's

28    position as the supervisor of a person who allegedly violated a plaintiff's constitutional

- 8 -

rights does not make him or her liable. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). A supervisor is liable in his or her individual capacity "only for constitutional violations from his [or her] subordinates if the supervisor participated in or directed the violations, or knew of the violations and failed to act to prevent them." *Id*.

In contrast, a suit against a defendant in his or her *official* capacity represents only another way of pleading an action against the entity that employs the defendant. *Graham*, 473 U.S. at 165. That is, the real party in interest is not the named defendant but instead the entity that employs the defendant. *Id*. at 166. To bring a claim against a person in his or her official capacity, a plaintiff must show that the constitutional deprivation resulted from the entity's policy, custom, or practice. *Id*.; *see also Monell v. Dep't of Soc. Servs. Of City of New York*, 436 U.S. 658, 694 (1978).

Because the real party in interest in an official-capacity suit is not the named defendant but instead the entity that employs the defendant, *Graham*, 473 U.S. at 166, "a suit against a state official in his or her official capacity . . . is no different from a suit against the State itself." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). Neither a State nor a state official sued in his or her official capacity may be sued for damages under 42 U.S.C. § 1983. *Will*, 491 U.S. at 71; *see also Gilbreath v. Cutter Bio., Inc.*, 931 F.2d 1320, 1327 (9th Cir. 1991) ("'arms of the State' such as the Arizona Department of Corrections are not 'persons' under section 1983"). A state official may be sued in his or her official capacity under § 1983 only for prospective declaratory or injunctive relief. *Will*, 491 U.S. at 71 n.10; *see also Coalition to Defend Affirmative Action v. Brown*, 674 F.3d 1128, 1134 (9th Cir. 2012).

### A.    Defendants Pratt, Centurion Health, and Martinez

Plaintiff does not connect any of the allegations in his FAC to Defendants Pratt, Centurion Health, or Martinez. The Court will therefore dismiss these Defendants.

### B.    Plaintiff's Eighth Amendment Threat-To-Safety Claims

The unnecessary and wanton infliction of pain constitutes cruel and unusual punishment prohibited by the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 102–

03 (1976). A convicted prisoner's threat-to-safety claim arises under the Eighth Amendment. *Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979). To state a threat-to-safety claim, a prisoner must allege (1) that he or she was incarcerated under conditions posing a substantial risk of harm and (2) that prison officials were "deliberately indifferent" to those risks. *Farmer v. Brennan*, 511 U.S. 825, 834 (1993). Deliberate indifference requires more than mere negligence or an ordinary lack of due care for the prisoner's safety. *Id*. at 835. To adequately allege deliberate indifference by a prison official, the prisoner must state facts to support that the prison official knew of, but disregarded, an excessive risk to the prisoner's health or safety. *Id*. at 837. Specifically, the prison official "must both [have been] aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed], and he [or she] must also [have] draw[n] the inference." *Id*.

"The Constitution 'does not mandate comfortable prisons,' but neither does it permit inhumane ones . . . ." *Farmer*, 511 U.S. at 832 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981)). Deprivations denying the minimal civilized measure of life's necessities, occurring through deliberate indifference by prison officials, are sufficiently grave to sustain an Eighth Amendment claim. *Keenan v. Hall*, 83 F.3d 1083, 1089 (9th Cir. 1996) (internal quotations omitted). In other words, "[p]rison officials have a duty to ensure that prisoners are provided adequate shelter, food, clothing, sanitation, medical care, and personal safety." *Johnson v. Lewis*, 217 F.3d 726, 731 (9th Cir. 2000). "The circumstance, nature, and duration of a deprivation of these necessities must be considered in determining whether a constitutional violation has occurred." *Id*. "The more basic the need, the shorter the time it can be withheld." *Hoptowit v. Ray*, 682 F.2d 1237, 1259 (9th Cir. 1982).

### 1.    Plaintiff's Access-to-Sanitation Claim in Count I

Subjecting a prisoner to "severe and prolonged" lack of sanitation "can constitute an infliction of pain within the meaning of the Eighth Amendment." *Anderson v. Cty. of Kern*, 45 F.3d 1310, 1314 (9th Cir. 1995). A temporary delay in allowing a prisoner to

use a restroom falls short of a constitutional deprivation, but the Eighth Amendment is implicated if a prison's restroom facilities are so inadequate that they inescapably result in prisoners urinating or defecating into their clothing. *Johnson*, 217 F.3d at 733; *see also Santos v. Corr. Corp. of Am.*, No. CV 11-630-PHX-JAT, 2011 WL 1375158, at *2–3 (D. Ariz. Apr. 12. 2011) (prisoner did not allege sufficiently serious deprivation where he was denied use of a toilet for one hour and thirty-five minutes, causing him to relieve himself in a bucket); *Saenz v. Reeves*, No. 1:09-CV-00557-BAM PC, 2012 WL 4049975, at *14 (E.D. Cal. Sept. 13, 2012) ("[D]enying Plaintiff access to a toilet and water for five and one half hours on one occasion and four and one half hours on a separate occasion, while he was kept in a holding cell, are not sufficient to rise to the level of a sufficiently serious deprivation to violate the Eighth Amendment."); *Salinas v. Cty. of Kern*, No. 118CV00235BAMPC, 2018 WL 5879703, at *4 (E.D. Cal. Nov. 7, 2018) ("Plaintiff's allegation that he was denied access to a restroom and water for approximately nine hours on a single day is insufficient to state a claim upon which relief may be granted."). To state a claim under the Eighth Amendment, a plaintiff must allege not only a sufficiently serious deprivation but also that "the defendant officials had actual knowledge of the plaintiffs' basic human needs and deliberately refused to meet those needs." *Johnson*, 217 F.3d at 734. A plaintiff may prove such knowledge through inference from circumstantial evidence. *Id.*

Plaintiff has not sufficiently alleged that any of the named individuals were personally involved in his alleged lack of access to sanitation facilities in the Manzanita Unit so as to state an Eighth Amendment claim against the defendants in their individual capacities. However, liberally construed, Plaintiff has stated an Eighth Amendment claim for prospective injunctive relief against Defendant Shinn in his official capacity. The Court will require Defendant Shinn to answer the access-to-sanitation claim in Count I for prospective injunctive relief only.

. . . .

. . . .

1

2
   **2.      Counts I(A) and I(C)**

3
   In Counts I(A) and I(C), and throughout Count I**,** Plaintiff avers that: (1) he is

4
vulnerable to COVID-19; (2) he cannot socially distance more than two feet from his

5
cellmate and more than four feet from his neighboring prisoner's cell; (3) the Manzanita

6
Unit houses double its capacity; (4) the ADCRR's IDSC plan fails to address social

7
distancing; (5) the IDSC plan "is a product of" Defendant Shinn and was implemented by

8
him; and (6) prisoners, including vulnerable prisoners such as himself, did not receive

9
face masks until July 2020. Liberally construed, Plaintiff has stated an Eighth

10
Amendment claim for prospective injunctive relief against Defendant Shinn in his official

11
capacity, and the Court will require Defendant Shinn to answer the above-stated claims

12
for prospective injunctive relief only.

13
   Plaintiff fails to allege sufficient facts to support a conclusion that Defendant

14
Ducey was aware of and disregarded a substantial risk of harm to Plaintiff's safety.

15
Knowing about the risks of COVID-19 to prisoners, having access to opinions from

16
national public health experts, such as from the CDC, and possible knowledge of the

17
number and manner of all prisoner deaths is insufficient to support a conclusion that

18
Defendant Ducey was deliberately indifferent to *Plaintiff's* safety. The Court will

19
therefore dismiss Defendant Ducey with respect to these claims. The Court will also

20
dismiss Defendants Pacheco, Baker, and Neil with respect to these claims, because

21
Plaintiff fails to provide factual specificity as to how their actions or inactions contributed

22
to his injuries, such as whether they had any input or authority to include or exclude

23
COVID-19 prevention strategies in the IDSC plan.

   **3.      Count I(B)**

24
   Plaintiff does not specify which particular named defendants are responsible for

25
the grievance he alleges in Count I(B). *See Rizzo*, 423 U.S. at 371–72, 377. Even if the

26
Court liberally construed the allegations in Count I(B) as being asserted against all of the

27
named defendants, Plaintiff fails to provide sufficient factual specificity about any

28
defendant's awareness of the condition or maintenance history of the air ducts in the

1    Manzanita Unit. The Court will therefore dismiss Count I(B) of Plaintiff's FAC.

2                    **4.    Count I(E)**

3           Plaintiff's allegations in Count I(E) are too vague and conclusory to support a

4    finding that Defendants Ducey, Shinn, Pacheco, Neil, and Baker were aware of, and

5    disregarded, a substantial risk of harm to Plaintiff's health and safety. First, although

6    Plaintiff states that the IDSC plan "is a product of" and was implemented by Defendant

7    Shinn, Plaintiff fails to allege whether Defendant Shinn was aware of the alleged

8    violations of the IDSC plan by ADC employees. Plaintiff does state that Defendants

9    Pacheco, Neil, and Baker make reports to him, but Plaintiff does not specify whether

10   those reports disclosed information regarding the alleged violations of the IDSC plan.

11   Second, although Plaintiff states that the workplaces of Defendants Pacheco, Neil, and

12   Baker are in the prison complex or housing unit where he is incarcerated, Plaintiff again

13   fails to allege whether they were aware of the alleged violations of the IDSC plan by

14   ADC employees. There is no respondeat superior liability for § 1983 claims and, here,

15   Plaintiff has not sufficiently alleged whether any named Defendant was aware of any

16   noncompliance with the IDSC plan and failed to act. *See Taylor*, 880 F.2d at 1045.

17   Therefore, the Court will dismiss Count I(E) of Plaintiff's FAC.

18          **C.    Plaintiff's Eighth Amendment Medical Care Claims**

19          Not every claim by a prisoner that he or she has not received adequate medical

20   treatment states a violation of the Eighth Amendment. *Estelle*, 429 U.S. at 105. "Under

21   42 U.S.C. § 1983, to maintain an Eighth Amendment claim based on prison medical

22   treatment, a [prisoner] must show 'deliberate indifference to serious medical needs' [by

23   the defendant(s)]." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (citing *Estelle*,

24   429 U.S. at 104). The Ninth Circuit requires a prisoner to make two showings to meet the

25   above test for deliberate indifference: (1) a serious medical need by demonstrating that

26   failure to treat his or her condition could result in further significant injury or unnecessary

27   and wanton infliction of pain, and (2) a deliberately indifferent response to the need by

28   the defendant(s). *Id.*

1    "Deliberate indifference is a high legal standard." *Toguchi v. Chung*, 391 F.3d

2    1051, 1060 (9th Cir. 2004). To act with deliberate indifference, the defendant must know

3    of, but disregard, an excessive risk to the prisoner's health or safety. *Farmer*, 511 U.S. at

4    837. Specifically, the defendant "must both be aware of facts from which the inference

5    could be drawn that a substantial risk of serious harm exists, and he [or she] must also

6    draw the inference." *Id*. In the context of prison medical treatment, deliberate

7    indifference may be shown by "(a) a purposeful act or failure to respond to a prisoner's

8    pain or possible medical need and (b) harm caused by the indifference." *Jett*, 439 F.3d at

9    1096. Additionally, deliberate indifference may be shown "when prison officials deny,

10   delay[,] or intentionally interfere with medical treatment, or . . . by the way in which

11   prison physicians provide medical care." *Hutchinson v. United States*, 838 F.2d 390, 394

12   (9th Cir. 1988) (citing *Estelle*, 429 U.S. at 104–05).

13           Deliberate indifference requires more than mere negligence or an ordinary lack of

14   due care for the prisoner's safety. *Farmer*, 511 U.S. at 835; *see also Broughton v. Cutter

15   Lab'ys*, 622 F.2d 458, 460 (9th Cir. 1980) (claims of "[m]ere 'indifference,' 'negligence,'

16   or 'medical malpractice'" will not support a cause of action under § 1983). A prisoner's

17   "complaint that a physician has been negligent in diagnosing or treating a medical

18   condition does not state a valid claim of medical mistreatment under the Eighth

19   Amendment." *Estelle*, 429 U.S. at 106. Furthermore, a difference of medical opinion as

20   to treatment of a prisoner does not amount to deliberate indifference to that prisoner's

21   serious medical needs. *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989) (explaining that

22   the prisoner had been seen by a variety of medical personnel, such as "a physician's

23   assistant, prison doctors, and outside physicians on numerous occasions").

24           Plaintiff's allegations in Count II are too vague and conclusory to support a

25   finding that Defendants Bell and Weizel were deliberately indifferent to his serious

26   medical needs. Although Plaintiff states that his medical records "detail[] his diminishing

27   lung capacity" and that he informed Defendants Bell and Weizel that he experiences

28   heart palpitations and shortness of breath when he inhales cigarette smoke coming from

neighboring cells, Plaintiff alleges that one of his previous medical providers, Dr. Seth, stated only that Plaintiff *may* benefit from a pulmonary consultation. This information is insufficient to infer that a substantial risk existed if Plaintiff was not seen by a pulmonologist. As previously stated in this Court's first screening order, Plaintiff's allegations, at most, suggest that Defendants Bell and Weizel were negligent in failing to examine Plaintiff's lungs, or negligent in failing to diagnose his condition correctly, and mere negligence does not amount to deliberate indifference. *See Broughton*, 622 F.2d at 460; *Estelle*, 429 U.S. at 106. The Court will therefore dismiss Defendants Bell and Weizel and Count II in Plaintiff's FAC.

Likewise, Plaintiff's allegations in Count III are too vague and conclusory to support a finding that Defendant Riley was deliberately indifferent to his serious medical needs. Plaintiff alleges that Riley checked his heart rate and temperature and listened to his chest and lungs with a statoscope before determining that Plaintiff did not meet the criteria for a pulmonary consultation. These allegations do not show that Defendant Riley failed to respond to Plaintiff's possible need for a pulmonary consultation but merely that Riley determined Plaintiff did not meet the criteria for such a consultation. Plaintiff's allegations suggest, at most, that Defendant Riley was negligent in failing to diagnose his condition correctly and, again, negligence does not amount to deliberate indifference. *See Broughton*, 622 F.2d at 460; *Estelle*, 429 U.S. at 106. Furthermore, although Dr. Seth's report stated that Plaintiff *may* benefit from a pulmonary consultation, Defendant Riley's difference in medical opinion does not amount to deliberate indifference to Plaintiff's serious medical needs. *See Sanchez*, 891 F.2d at 242. The Court will therefore dismiss Defendant Riley and Count III of Plaintiff's FAC.

### D.    Plaintiff's Due Process Claims

Although Plaintiff designates all counts as Eighth Amendment threat-to-safety claims, the Court will construe Counts I(D) and I(F) as due process claims, as Plaintiff alleges that Defendants are depriving him and other prisoners of opportunities to either reduce their sentences or serve the remaining portion of them outside the prison setting.

In conducting due process analysis, "[t]he threshold question . . . is whether a constitutionally protected interest is implicated." *Baumann v. Ariz. Dep't of Corr.*, 745 F.2d 841, 843 (9th Cir. 1985) (citing *Meachum v. Fano*, 427 U.S. 215, 223–24 (1976)). "Not every 'grievous loss' suffered at the hands of the state will [invoke] the procedural protection of constitutional due process." *Id.* at 834 (citing *Meachum*, 427 U.S. at 224). Additionally, "[t]here is no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence." *Greenholtz v. Inmates of Neb. Penal and Corr. Complex*, 442 U.S. 1, 7 (1979). However, a state may "create[] a protected liberty interest by placing substantive limitations on official discretion." *Olim v. Wakinekona*, 461 U.S. 238, 249 (1983). "If the decisionmaker is not 'required to base its decisions on objective criteria,' but instead 'can deny the requested relief for any constitutionally permissible reason or for no reason at all,' . . . the [s]tate has not created a constitutionally protected liberty interest." *Id.* (quoting *Conn. Bd. of Pardons v. Dumschat*, 452 U.S. 458, 467 (1981) (Brennan, J., concurring)). Moreover, published prison regulations "that place no substantive limitations on official discretion" likewise do not create a constitutionally protected liberty interest. *Olim*, 461 U.S. at 249–50; *see also Baumann*, 745 F.2d at 844.

In Arizona, the ADC director has discretion to authorize that an inmate be temporarily removed from custody "for the purpose of employing the inmate in any work directly connected with the administration, management[,] or maintenance of the prison or institution in which the inmate is confined, for purposes of cooperating voluntarily in medical research that cannot be performed at the prison or institution, or for participating in community action activities directed toward delinquency prevention and community betterment programs." A.R.S. §§ 31-233(A) and 41-1604.11(A). "Under specific rules established by the [ADC] director for the selection of inmates, [he or she] may also authorize furlough, temporary removal[,] or temporary release of any inmate for compassionate leave, for the purpose of furnishing to the inmate medical treatment not available at the prison or institution, for purposes preparatory to a return to the

community within ninety days of the inmate's release date or for disaster aid, including local mutual aid and state emergencies." A.R.S. §§ 31-233(B) and 41-1604.11(B). Furthermore, under Arizona law, the Arizona Board of Executive Clemency ("ABEC") has discretionary authority to release an inmate on work furlough, A.R.S. § 41-1604.11(C), or to a home release program, A.R.S. § 41-1604.13(B).

Discretion is emphasized again in Rule 8.1 under ADC's Department Order 1002, which governs the temporary release of inmates who "*may* be authorized by the Director or designee for a supervised discretionary release for up to 90 calendar days prior to a designated release, for purposes preparatory to a return to the community" if they "are statutorily eligible pursuant to A.R.S. § 31-2333(A) or (B) or A.R.S. § 41-1604.11(A) or (B)."[5] Furthermore, Rule 8.9 provides that the temporary release of an inmate "is a privilege, not a right of the inmate/offender," and that the authorization for a temporary release of an inmate is "determined at the sole discretion of the Director or designee, contingent upon [the Time Computation Unit's] verification of statutory eligibility."[6]

As previously stated in the screening order of Plaintiff's initial complaint, an inmate's interest in parole does not by itself trigger due process protections because there is no entitlement to reduction of a valid sentence. *See Conn. Bd. of Pardons*, 452 U.S. at 464. But if a state statute mandates parole via specified criteria, an interest protected by the Due Process Clause may arise. *Greenholtz*, 442 U.S. at 12. Thus, in *Greenholtz*, the Supreme Court held that the Nebraska parole board did not violate the plaintiffs' due process rights because the board followed the state parole statutes, which afforded the plaintiffs an opportunity to be heard and informed them of the reasons why they were denied parole. *Id.*

In Arizona, a prisoner "who has been certified *eligible* for parole or absolute discharge from imprisonment" under A.R.S. §§ 31-412(B) or 41-1604.09 must be given "an *opportunity* to apply for release on parole or for an absolute discharge from

---

[5]  *Department Order 1002 – Inmate Release Eligibility System*, ADCRR, https://corrections.az.gov/sites/default/files/policies/1000/1002_031021.pdf.
[6] *Id.*

1    imprisonment." A.R.S. § 31-411(A) (emphasis added). In addition, a prisoner "who is

2    *eligible* for release on parole or for absolute discharge from imprisonment shall be given

3    *an opportunity* to be heard," either before a hearing officer designated by the Board or by

4    the Board itself. A.R.S. § 31-411(B) (West 2012) (emphasis added).

5         Plaintiff thus has no constitutionally protected liberty interest in custodial release

6    on work furlough and home arrest. Additionally, his susceptibility to the COVID-19 virus

7    does not create a due process right to parole or early or temporary release. Therefore,

8    Defendant Ducey's failure to consider, instruct, or even recommend that home arrest,

9    work furlough, and other early release tools be utilized and created by Defendant Shinn

10   and the ABEC for Plaintiff and other prisoners does not violate Plaintiff's constitutional

11   rights. Defendant Shinn's failure to revise, consider, and/or create the use of these tools

12   likewise does not violate Plaintiff's constitutional rights. Accordingly, the Court will

13   dismiss Counts I(D) and I(F) in Plaintiff's FAC.

14   **VII.    Motion for Leave to File Supplemental Complaint**

15            **A.    Supplemental Complaint**

16         In **Counts I and II** of his supplemental complaint, Plaintiff avers the following:

17   On October 27, 2020, Defendant Espinoza scheduled Plaintiff for a COVID-19 test,

18   given that Plaintiff had an upcoming offsite capsule endoscopy appointment. (Doc. 20 at

19   4.) Plaintiff's COVID-19 test result was negative. (*Id.*) Defendant Hines initiated

20   Plaintiff's capsule endoscopy appointment. (*Id.*) Requests for offsite medical

21   consultations by Defendant Hines go to the Facility Health Administrators, K. Switzer

22   and B. Richey, for their authorization. (*Id.*) Such requests are ultimately approved by

23   John Doe and Jane Doe, the Utilization Management Team. (*Id.*) On October 29, 2020 at

24   4:00 a.m., Defendants John Doe #1 and #2 (hereinafter "JDs 1 and 2"), who are medical

25   transport officers, arrived at the Manzanita Unit to transport Plaintiff to his capsule

26   endoscopy appointment in Phoenix at the Maricopa County Hospital. (Doc. 20 at 4, 7). At

27   the time of their arrival, JDs 1 and 2 were wearing masks; upon their departure from

28   ASPC-Tucson, they immediately removed their masks and did not wear them during the

two-hour trip to the hospital. (*Id*. at 7, 15.) Plaintiff wore his mask during this time. (*Id*. at 7.)

At the conclusion of Plaintiff's capsule endoscopy, JDs 1 and 2, without masks, transported Plaintiff to the Alhambra Detention Center Intake ("ADCI") for an eight-hour layover to be monitored by hospital staff. (*Id*. at 4, 8.) The ADCI is where newly arrested parole violators who have not been tested for COVID-19 and county prisoners are held. (*Id*. at 8.) JDs 1 and 2 dropped Plaintiff off at the ADCI, where Plaintiff was among unmasked and non-COVID-19 tested prisoners. (*Id*.) When JDs 1 and 2 returned to the ADCI, Plaintiff was escorted out of the ADCI by a correctional officer and an unmasked prisoner. (*Id*.) Then, JDs 1 and 2, wearing masks, escorted Plaintiff to the transport van, but, when leaving the ADCI parking lot, they removed their masks. (*Id*.) In the van, Plaintiff sat in the back, within three to four feet from JDs 1 and 2. (*Id*.) On their way back to ASPC-Tucson, JDs 1 and 2 told Plaintiff that they spent their day having breakfast at Lolo's Chicken and Waffles, socializing with females at a female cyclist/spin class, and visiting unmasked friends, all while not wearing masks themselves and not practicing social distancing. (*Id*. at 9, 15.) Nearing ASPC-Tucson two hours after leaving Phoenix, JDs 1 and 2 put their masks back on. (*Id*. at 9.)

Upon entering the Manzanita Unit, Plaintiff went directly to the medical unit because he was not feeling well. (*Id*.) Defendant John Doe Unit Nurse took Plaintiff's temperature; however, he failed to test Plaintiff for COVID-19. (*Id*.) Plaintiff continued to feel ill that same night and again went to the medical unit, but Officer Maldonado and/or C.O. II told Plaintiff to fill out a Health Needs Request ("HNR") because the two on-duty nurses were busy, although they were "actually sitting on their rears doing nothing." (*Id*. at 9, 15.) On November 3, 2020, Plaintiff submitted an HNR stating that he had been experiencing a scratchy throat and runny nose since November 1, 2020. (*Id*. at 10.) On November 4, 2020, Plaintiff received a response from the medical unit instructing him to gargle with warm water and salt and to submit another HNR if his symptoms worsen. (*Id*.) On November 6, 2020, Plaintiff submitted another HNR stating

that he had a sore throat. (*Id*.)

On or about November 6, 2020, Plaintiff's dormitory was placed under quarantine. (*Id*.) Each time there was a prisoner newly infected with COVID-19, a two-week quarantine extension was imposed by the prison. (*Id*. at 11.) On or about November 7, 2020, Plaintiff's condition worsened, as he threw up, coughed, and sneezed, experienced chills and a fever, and laid on his back for 12 hours without moving and without eating or drinking. (*Id*. at 10.) Plaintiff asked C.O. II Barns to initiate an ICS and told him that he wanted to self-quarantine to avoid infecting other prisoners. (*Id*.) Plaintiff was taken to the medical unit where Defendant Jane Doe Unit Nurse checked his heart rate and blood pressure. (*Id*. at 10, 14.) At that time, Plaintiff was not tested for COVID-19. (*Id*. at 10.) Plaintiff was then placed in solitary confinement, not medical isolation. (*Id*.) On November 10, 2020, Plaintiff was tested for COVID-19, 12 days after Plaintiff's return from his offsite medical appointment. (*Id*. at 6, 10.) During these 12 days, Plaintiff ate in his housing unit's cafeteria, sitting within one foot of other inmates, and slept within three feet of other inmates who were not wearing masks. (*Id*. at 12.) On November 16, 2020, while in solitary confinement and still "sick and feeling the full effects of COVID-19," staff informed Plaintiff that he and about 10 other infected prisoners had to return to their 48-man dormitory, where 28 uninfected prisoners were housed. (*Id*. at 10–11.)

On November 25, 2020, Plaintiff submitted an informal medical complaint, which C.O. III Deebum sent to C.O. IV Stangl. (*Id*. at 12.) C.O. Deebum ignored Plaintiff's reminder that his complaint was a medical one. (*Id*.) C.O. III Vance, Plaintiff's C.O. III, was on vacation due to the Thanksgiving holiday and thus Plaintiff had to locate C.O. Deebum to submit his complaint. (*Id*.) On November 30, 2020, Plaintiff received a response from C.O. IV Stangl, which stated that he needed to have submitted his informal complaint within 10 working days from the date of the action that caused the complaint and thus that Plaintiff's complaint was filed outside that time frame. (*Id*.) On December 3, 2020, Plaintiff submitted a grievance response to C.O. IV Stangl informing him that during that time frame he was infected with COVID-19, his dormitory was placed under

quarantine, and thereafter he was placed in solitary confinement. (*Id.* at 12–13.) On December 8, 2020, Plaintiff received a response from C.O. IV Stangl stating that his grievance was being returned to him unprocessed because it did not have an assigned case number and was submitted outside the appropriate time frame. (*Id.* at 13.) On December 12, 2020, Plaintiff submitted an Inmate Grievance Appeal to the ADC Director, David Shinn, and received a response from C.O. IV Stangl stating that Plaintiff could not appeal an unprocessed grievance. (*Id.*)

Based on these events, Plaintiff alleges Eighth Amendment claims against: (1) Defendants Hines, K. Switzer, Padovano, Espinoza, B. Richey, Unit Nurses John Doe and Jane Doe, John Doe and Jane Doe from the Utilization Management Team, Centurion Health, Centurion Director Dr. Wendy Orm, and A. Thrush for their failure to test Plaintiff, as well as other prisoners, upon their return from offsite medical appointments and to medically isolate them from the general population to avoid spreading COVID-19; (2) JDs 1 and 2, his medical transport officers, for their failure to wear face masks during the 10 hours they travelled together on October 29, 2020 and their failure to follow CDC guidelines and the ADCRR's protocols requiring them to undergo health checks before entering each ADC facility; and (3) Deputy Warden Neil for his failure to (i) take charge of the ADCRR's COVID-19 Management Strategy IDSC plan, (ii) follow CDC guidelines to make sure no prisoners returned from offsite medical appointments without first getting tested for COVID-19 and being medically isolated, and (iii) strictly comply with ADC's policies and practices. (*Id.* at 5, 7, 9, 11, 15–16.) Plaintiff also lists the following individuals as defendants: Director of Offender Services Canson McWilliams, Director of Health Services Richard Pratt, Appeals Officer L. Purden, General Counsel C.R. Glynn, C.O. IV Michoff, and David Shinn. (*Id.* at 1–2.)

## B.    Discussion

Plaintiff requests that the Court grant him leave to file his supplemental complaint, given that it adds new claims that have occurred since the filing of his original complaint. (Doc. 19.) Defendant Shinn asks that the Court deny Plaintiff's request because his new

claims are unrelated to him, have not been properly exhausted, consist of unsupported speculation about the actions of medical and prison staff causing him to be infected with the COVID-19 virus, and allege nothing more than isolated acts of negligence. (Doc. 23.) In his Reply, Plaintiff argues that his new claims are not unrelated; his exhaustion efforts have been significantly thwarted by C.O. IV Stangl, who has exhibited a pattern of refusing to process valid past grievances; he could not file a timely grievance due to contracting COVID-19; and his medical-related grievance should have been addressed by a medical provider rather than C.O. IV Stangl. (Doc. 29 at 1–6.)

## 1.    Relationship Between Initial and Supplemental Claims

Pursuant to Federal Rule of Civil Procedure 15(d), a court may permit a party to supplement a complaint in order to set out "any transaction, occurrence, or event that happened after the date of the pleading to be supplemented." Fed. R. Civ. P. 15(d). That is, Rule 15(d) permits the filing of a supplemental pleading to "introduce[] a cause of action not alleged in the original complaint and not in existence when the original complaint was filed," *United States v. Reiten*, 313 F.2d 673, 674–75 (9th Cir. 1963), and allows persons participating in these new events to be added if necessary, *Griffin v. Cty. Sch. Bd. of Prince Edward Cty.*, 377 U.S. 218, 227 (1964). While granting leave to file a supplemental complaint is favored, "it cannot be used to introduce a separate, distinct[,] and new cause of action." *Planned Parenthood of S. Ariz. v. Neely*, 130 F.3d 400, 402 (9th Cir. 1997) (internal citations and quotation marks omitted).

Construed liberally, the Court finds that Plaintiff's supplemental complaint does not involve a new and distinct action, as his new claims relate to defendants developing inadequate procedures to prevent and manage the spread of the COVID-19 virus—his chief complaint in his initial pleading. Therefore, Defendant's argument that the claims in Plaintiff's supplemental complaint do not relate to him does not support a denial of leave to file the supplemental complaint.

## 2.    Failure to Exhaust Administrative Remedies

The Prison Litigation Reform Act ("PLRA") requires a prisoner to "exhaust

- 22 -

available administrative remedies before bringing a federal action concerning prison conditions." *Griffin v. Arpaio*, 557 F.3d 1117, 1119 (9th Cir. 2009); 42 U.S.C. § 1997e(a).[7] This requirement extends to cases where a plaintiff seeks a remedy not available through the administrative process, such as monetary damages. *Booth v. Churner*, 532 U.S. 731, 733–34 (2001). A prisoner's "[c]ompliance with prison grievance procedures . . . is all that is required by the PLRA to properly exhaust." *Jones v. Bock*, 549 U.S. 199, 218 (2007) (internal quotations omitted). "If a prisoner had full opportunity and ability to file a grievance timely, but failed to do so, he has not properly exhausted his administrative remedies." *Marella v. Terhune*, 568 F.3d 1024, 1028 (9th Cir. 2009) (per curiam). Proper exhaustion under the PLRA is mandatory and cannot be satisfied "by filing an untimely or otherwise procedurally defective administrative grievance or appeal." *Woodford v. Ngo*, 548 U.S. 81, 83–84 (2006). Furthermore, if a prisoner includes newly added claims in his amended complaint based on conduct that occurred after the filing of his initial complaint, the above-stated exhaustion requirement likewise applies—that is, the prisoner must "show that the new claims were exhausted before tendering the amended complaint." *Akhtar v. Mesa*, 698 F.3d 1202, 1210 (9th Cir. 2012).

"[F]ailure to exhaust is an affirmative defense under the PLRA." *Jones*, 549 U.S. at 216. The defendant bears the initial burden to show that there was an available administrative remedy and the prisoner failed to exhaust it. *Albino v. Baca*, 747 F.3d 1162, 1172 (9th Cir. 2014). Once the defendant makes that showing, the burden shifts to the prisoner, who must show either that he did in fact exhaust the administrative remedies or that "something in his particular case . . . made the existing and generally available administrative remedies effectively unavailable to him." *Id*. The ultimate burden, however, remains with the defendant. *Id*. The administrative remedies "must indeed be 'available' to the prisoner." *Ross v. Blake*, 136 S.Ct. 1850, 1856 (2016). Aside from that qualifier, "the PLRA's text suggests no limits on an inmate's obligation to exhaust— irrespective of any 'special circumstances.'" (*Id.*) In other words, the PLRA's

---

[7] This requirement extends but is not limited to suits under 42 U.S.C. § 1983. *Albino v. Baca*, 747 F.3d 1162, 1171 (9th Cir. 2014).

1  "mandatory language means a court may not excuse a failure to exhaust, even to take

2  such circumstances into account." (*Id.*).

3      Section 2.2 under ADC Department Order 802 specifies that a prisoner must

4  initiate his or her informal complaint "within ten workdays from the date of the action

5  that caused the complaint."[8] This rule applies to both medical and non-medical

6  complaints.[9] If the prisoner is unable to resolve his or her complaint informally, the

7  prisoner may proceed with a formal grievance and thereafter an appeal.[10] The decision of

8  the latter process "is final and constitutes exhaustion of all remedies within the

9  Department."[11]

10      In his supplemental complaint, Plaintiff alleges that he did not receive a COVID-

11  19 test upon his return from his offsite medical appointment on October 29, 2020, despite

12  alleging that he was possibly exposed to the virus (Doc. 20 at 8, 10, 14–15), and that his

13  COVID-19 test was delayed until November 10, 2020. (*Id.* at 10).[12] On November 25,

14  2020, Plaintiff submitted an informal medical complaint about these grievances to C.O.

15  III Deebum, who then gave it to C.O. IV Stangl. (*Id.* at 12; *see also* Doc. 23-1 at 7–9.) On

16  November 30, 2020, C.O. IV Stangl returned Plaintiff's complaint unprocessed on the

17  grounds that it was not timely submitted. (Doc. 20 at 12; *see also* Doc. 23-1 at 6.)[13]

18  Plaintiff subsequently attempted to utilize the formal grievance and appeal processes, but

19  ———————————————

20  [8]  Department Order 802 – Inmate Grievance Procedure, ADCRR,
https://corrections.az.gov/sites/default/files/policies/800/0802_020721.pdf.
[9] *Id.*
21  [10] *Id.*
[11] *Id.*
22  [12] Plaintiff avers that he was tested for COVID-19 on November 10, 2021 (Doc. 20 at
10); however, Defendant states that Plaintiff received a positive COVID-19 test on
23  November 13, 2020, thus making that the date of the action that caused his complaint
(Doc. 23 at 2). Additionally, C.O. IV Stangl states in his response to Plaintiff's informal
24  complaint that the date of Plaintiff's offsite medical appointment occurred on October 31,
2021 (Doc. 23-1 at 6), presumably indicating that it is the date of the action that caused
25  his complaint. For purposes of Plaintiff's Motion for Leave to File a Supplemental
Complaint, the Court accepts that Plaintiff's offsite medical appointment occurred on
26  October 29, 2020 and that he was tested for COVID-19 on November 10, 2020—as
stated in his proposed supplemental complaint—and will thus use these dates in
27  evaluating the parties' arguments.
[13] Although C.O. IV Stangl's response states that Plaintiff submitted his complaint to
28  C.O. III Vance on November 30, 2020, the Court finds that Plaintiff submitted his
complaint on November 25, 2020, given that Plaintiff avers that C.O. III Vance was on
vacation and that he gave his complaint to C.O. Deebum on that date. (Doc. 20 at 12.)

his attempts failed.[14]

Within the 10-workday periods after both October 29, 2020 and November 10, 2020, Plaintiff contends that he felt ill due to a COVID-19 diagnosis; his dormitory was placed under quarantine; he was placed in solitary confinement; quarantine extensions were imposed by the prison each time a prisoner was newly infected with COVID-19; and his C.O. III (Vance) was on vacation at the time he wanted to initiate the grievance process. (Doc. 20 at 9–12.) Moreover, Plaintiff argues that his informal complaint should have been reviewed by a medical provider. (Doc. 29 at 5.) Additionally, the Court notes that Plaintiff has previously averred that he has no access to legal resources during quarantine periods (Doc. 13), and so it is unknown if access to complaint forms are likewise inaccessible during such periods. Thus, the Court finds that there is insufficient information to determine whether the above-stated circumstances "made the existing and generally available administrative remedies effectively unavailable to [Plaintiff]," s*ee Albino*, 747 F.3d at 1172, or whether Plaintiff had "full opportunity and ability to file [his] grievance timely," s*ee Marella*, 568 F.3d at 1028. Therefore, Defendant's failure-to-exhaust argument does not support denying Plaintiff leave to file his proposed supplemental complaint.

### 3.    Failure to State a Claim

The Court will nonetheless deny Plaintiff's Motion for Leave to File a Supplemental Complaint because Plaintiff's proposed supplemental complaint fails to state a claim against any of the defendants named therein.

***Defendants Hines, K. Switzer, Espinoza, B. Rickey, and John and Jane Doe from the Utilization Management Team***

Plaintiff alleges that the above-named defendants failed to develop adequate COVID-19 screening procedures upon the return of prisoners, such as himself, from offsite medical appointments. However, these allegations are too vague and conclusory to

---

[14] Plaintiff's formal grievance was returned unprocessed as it was untimely and without an assigned case number, and his appeal was returned on the ground that appealing an unprocessed grievance is prohibited. (Doc. 20 at 12–13; *see also* Doc. 23-1 at 2–5.)

support a conclusion that the named defendants were deliberately indifferent to Plaintiff's alleged immediate need for a COVID-19 test or medical isolation. Plaintiff merely describes the roles that each defendant played in arranging his offsite endoscopy appointment, which neither shows that the defendants were aware of his suspected exposure to the COVID-19 virus throughout that day nor the fact that he was feeling ill upon his return from his appointment.

### Defendants John and Jane Doe (Unit Nurses)

Plaintiff alleges that Unit Nurses John Doe and Jane Doe failed to test Plaintiff for COVID-19. These allegations are likewise too vague and conclusory to support a conclusion that these defendants were deliberately indifferent to Plaintiff's medical needs. Other than stating that these defendants checked his temperature, heart rate, and blood pressure, Plaintiff provides no additional factual specificity regarding his medical visits with them, such as how or why they determined that he did not need to be tested for COVID-19 and whether he informed them about his suspected exposure to the virus the day of his offsite medical appointment. With the limited facts Plaintiff provides, the defendants' decision to not test Plaintiff for COVID-19, at most, amounts to negligence, which is not equivalent to deliberate indifference. *See Broughton*, 622 F.2d at 460; *Estelle*, 429 U.S. at 106.

### Defendants A. Thrush, Padovano, and Dr. Wendy Orm

Plaintiff alleges that the above-named defendants failed to develop adequate COVID-19 screening procedures for prisoners returning from offsite medical appointments. However, Plaintiff does not connect any of these defendants to the events detailed in his supplemental complaint, nor does he state that they had any knowledge of those events.

### Defendants JDs 1 and 2 (Medical Transport Officers)

Plaintiff fails to allege sufficient facts to support a conclusion that JDs 1 and 2 were aware of and disregarded a substantial risk of harm to Plaintiff's safety. Plaintiff merely suspects that these defendants exposed him to COVID-19 because of their actions

throughout the day when they transported him to his medical appointment. At most, Plaintiff's allegations suggest that JDs 1 and 2 were negligent in failing to wear their face masks at all times; however, their negligence does not amount to deliberate indifference. *See Farmer*, 511 U.S. at 835.

### *Defendant Neil*

Plaintiff likewise fails to allege facts to support a conclusion that Defendant Neil was aware of and disregarded a substantial risk of harm to Plaintiff's safety. Specifically, Plaintiff fails to state whether Defendant Neil had any knowledge of the events detailed in his supplemental complaint. Plaintiff merely states that Defendant Neil knew that the only way prisoners became infected with COVID-19 is by prison *employees* bringing the virus into the prison (Doc. 20 at 11), which is unrelated to Plaintiff's overall concern about prisoners possibly becoming infected with the virus during their offsite medical appointments.

### *Defendant Centurion Health*

To state a claim under § 1983 against a private entity performing a traditional public function, such as providing medical care to prisoners, a plaintiff must allege facts to support that his or her constitutional rights were violated as a result of a policy, decision, or custom promulgated or endorsed by the private entity. *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1138–39 (9th Cir. 2012). A private entity is not liable merely because it employs persons who allegedly violated a Plaintiff's constitutional rights. *Id*. at 1139. Here, Plaintiff does not allege that any of the events described in his supplemental complaint resulted from a policy, decision, or custom of Defendant Centurion Health.

### *Defendants McWilliams, Pratt, L. Purden, C.R. Glynn, C.O. IV Michoff, and Shinn*

Plaintiff lists the above-named individuals in his supplemental complaint but does not connect any of them to the events detailed in his supplement nor state that they had any knowledge of those events.

Because Plaintiff's proposed supplemental complaint fails to state a claim against any of the defendants named therein, the Court will deny leave to file the supplemental

complaint on grounds of futility.

**IT IS ORDERED:**

(1) Plaintiff's Motion to Strike Defendant's Responses to Plaintiff's Motions for Leave to File an Amended Complaint and a Supplemental Complaint (Doc. 26) is **denied**.

(2) Plaintiff's Motion for Leave to File an Amended Complaint (Doc. 17) is **granted**.  The Clerk of Court is directed to file Plaintiff's proposed First Amended Complaint (lodged at Doc. 18).

(3) Plaintiff's Motion for Leave to File a Supplemental Complaint (Doc. 19) is **denied**.

(4) All Defendants except Defendant Shinn in his official capacity are **dismissed without prejudice**.

(5) Defendant Shinn in his official capacity must answer Count I for prospective injunctive relief only, as set forth above.

(6) Plaintiff's claims for money damages are **dismissed without prejudice**.

Dated this 4th day of June, 2021.

Honorable Rosemary Márquez
United States District Judge